HILTON HOTELS INTERNATIONAL, INC., ET AL., Petitioners, *v.* MINIMUM WAGE BOARD OF PUERTO RICO, Respondent.

No. 108. Argued March 3, 1953.—Decided April 22, 1953.

632

*McConnell & Valdés* and *Elmer Toro Lucchetti,* for petitioner Hilton Hotels International, Inc. *Córdova & González* and *Hernán Franco,* for petitioners De Miko and Central Caribbean Hotel Ass'n, Inc. *Joaquín Gallart Mendía* and *Domingo Candelario,* for respondent.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

The petitioners have filed in this Court a petition for review challenging the validity of certain parts of Mandatory Decree No. 22, approved by the Puerto Rico Minimum Wage Board on August 6, 1952, which decree is applicable to hotel businesses. In their petition they have set forth a multiplicity of objections to the validity of that decree.

As a preliminary point of law, the respondent Board asks us to deny the review because this Court lacks jurisdiction thereof on the ground that the petitioners did not originally urge their objections before the Board and therefore that they have not exhausted their administrative remedies as required by the Puerto Rico Minimum Wage Act. (Act No. 8 of April 5, 1941, Sess. Laws p. 302, as amended.)

We have examined the record of this case and we find that many of the objections urged before this Court by the petitioners were first raised before the Board after the publication of a draft for a decree and before the final approval of Decree No. 22. The other objections were not presented to the Board and are now presented before this Court, but these objections refer to new provisions contained in the decree and which were not a part of the draft for a decree.

In many statutes which refer to actions of administrative agencies a rule has been established requiring that administrative remedies be in some way exhausted as a preliminary to judicial review and as an essential requisite to clothe the appellate court with jurisdiction. It has been specifically provided that no objection to an administrative action that has not been originally urged before the agency involved shall be considered by a court.[1] Now, the procedural requirements as to the presentation of objections administratively are a part of the review or appeal sought from the

[1] As to the Fair Labor Standard Act, see 29 U.S.C.A., § 210. In connection with "Securities & Exchange Commission", see 15 U.S.C.A., § 79x. On actions of the Price Administrator, see 50 U.S.C.A. Appendix, § 924.

courts. The mode, manner and method of seeking judicial review of administrative actions should be governed by the specific provisions of the statute in question. The mode of procedure employed for judicial review against agencies or board actions shall be controlled by the special laws referring to them specifically. *Caparra Country Club* v. *Planning Board*, 74 P.R.R. 69; *Levers* v. *Anderson*, 326 U. S. 219, referring to motions for administrative reviews; 48 Yale L. J. 981: *Exhaustion of Administrative Remedies;* 62 Harv. L. Rev. 1216, 1221. Therefore, the motion to dismiss filed by the Board should be determined in the light of the provisions of our Minimum Wage Act. Section 24 of this Act, as amended by Act No. 48 of June 10, 1948, provides as follows:

"Section 24.—In every proceeding for the violation of any of the provisions of this Act, or of a decree, regulation, resolution, rule or order promulgated hereunder, it shall be considered prima facie that the minimum wage, the maximum working hours, and the labor conditions fixed in the manner established by this Act, are reasonable and lawful and constitute the living wage, the maximum working hours, and the labor conditions which the Act itself requires.

"The findings of fact at which the board, acting within its powers, may arrive, shall, in the absence of fraud, be conclusive. Any person aggrieved by any decree, regulation, resolution, or order of the board may, within the term of fifteen days after the promulgation of the mandatory decree or of the resolution or order, file petition for review in the Supreme Court of Puerto Rico. Various actions for review may be joined in a single action, when the questions raised therein are identical. The court may affirm, annul, or remand to the board for further action, the decree, regulation, resolution, or order; but the annulment or remanding shall be only on the ground that the board acted without authority or beyond its powers, if said questions were specifically and opportunely raised before the board, following the procedure provided for in sections 9 and 10 for setting forth objections and proposing amendments in

The above-copied § 24 provides that questions raised against a minimum wage decree should be raised following the procedure provided for in §§ 9 and 10 of the same Act for setting forth objections and proposing amendments in connection with the adoption of decrees. Sections 9 and 10 provide as follows:

"Section 9.—(As amended by Act No. 48 of June 10, 1948). As soon as the board has adopted the said draft for a decree, the same shall be made known by publication in at least one daily newspaper of general circulation in the country, and a copy shall be furnished to any interested person who requests it. The publication shall include a notice, which shall be inserted before the copy of the draft, warning that the same has been introduced, that there are available copies thereof to be sent or furnished the interested parties, and that, within the fifteen days following the date which shall be stated in the notice itself, any person or party who may be aggrieved or adversely affected by the proposed decree, shall be entitled to file a written statement under oath stating the nature of such prejudice or adverse interest, setting forth his objections thereto or proposing such amendments as he may consider pertinent for the draft, and setting forth the evidence available to him for the support of his contentions.

"If the said fifteen days expire without a statement in the manner prescribed by the preceding paragraph being received in the office of the secretary of the board, the draft shall become a mandatory decree as published, and shall take effect with the force of law fifteen days after notice thereof has been published in one newspaper of general circulation in the country, unless a longer term is provided by the board, which term shall not exceed ninety (90) days from the publication of said notice."

"Section 10.—(As amended by Act No. 48 of June 10, 1948). Whenever any person or party makes the written statement mentioned in the preceding section, as well as in any other case in which the board may deem it advisable, the date and place shall be fixed for the holding of a public hearing for the purpose of considering the draft for the decree and of determining whether or not the same shall be finally approved to govern and bind the employers, employees and laborers of the industry, busi-

ness, or occupation investigated. The said hearing, which shall be held before the board, the chairman thereof, or a receiver of evidence appointed by him, shall be advertised by notice published in at least one newspaper having the largest general circulation in the country, not less than ten days in advance of such hearing. In said hearing the board shall offer as evidence all such statistics, surveys, investigations, data, documents, testimonies, and any other information as it may deem pertinent; and interested parties shall be heard, and all the pertinent evidence they adduce shall be received. Stenographic record shall be made of the proceedings.

"The board shall grant any person who may so request at the closing of the hearing, a term of not less than ten (10) days within which to file written statements setting forth objections or proposing amendments to the draft for a decree, based on the evidence submitted and heard in the hearing.

"Upon expiration of the term to file written statements, the board shall proceed to issue a mandatory decree for the industry, business or occupation in question, which shall take effect with the force of law fifteen (15) days after notice for the purpose is published in a newspaper having the largest general circulation, unless a later effective date is provided for in the said notice, which date shall in no case exceed ninety (90) days from the publication of the said notice."

According to these statutory provisions a petitioner is compelled, as a prerequisite to judicial review in this Court, to set forth his objections or propose amendments to the draft for decree after said draft for decree has been adopted and published and before the issuance of the final mandatory decree for the industry, business, or occupation in question. The Act does not provide as a prerequisite to judicial review that objections be presented or amendments be proposed after the issuance of the mandatory decree. The intention is clear. It was meant to give the Board an opportunity to review and correct any error in the draft for a decree before the approval of a final decree. This rule embodies a salutary policy since it affords the Board the opportunity to consider on the merits objections to be urged against the draft for a decree having especially in mind the capacity and the expert knowledge

of the members of the Board as to the technical problems submitted to them and bearing in mind also the convenience of obtaining an orderly administration of justice. *Marshall Field & Co.* v. *Board*, 318 U. S. 253, 256; 48 Yale L. J. 981; Davis, *Administrative Law*, 614 *et seq.*

As we have noted the petitioners complied strictly with the requirements of §§ 9 and 10 and 24 of the Act as to most of the objections urged in this Court and they presented before the Board, in writing, the objections and proposals of amendments, including their challenge to the constitutionality of some of the portions of the decree, after the draft for a decree had been published and before approving, in definitive form, the mandatory decree. It is true that the remaining objections were not raised before the Board, but as we have already stated, these objections could not have been raised in accordance with the law inasmuch as they referred to new matters which had not been included in the draft for a decree and which were incorporated, by way of addition, into the mandatory decree. The Act does not require that objections be raised and amendments proposed after the mandatory decree is approved. Such a requirement would be tantamount to a motion for rehearing. In those cases where the statute specifically requires the filing of a motion for rehearing as a precondition to judicial review, the absence of said motion would be fatal and it would imply lack of jurisdiction on the part of the court. *A. Roig Sucrs.* v. *Minimum Wage Board*, 67 P.R.R. 545; Parker, *Administrative Law*, p. 254 *et seq.;* Davis, *Administrative Law*, p. 638. However, as the Act does not require a motion for reconsideration the failure to file said motion before the agency in question does not defeat the jurisdiction of the appellate court. Our present Minimum Wage Act does not contain said requirement.[2] *Levers* v. *Anderson, supra.* In the absence of

[2] It is interesting to note that our Minimum Wage Act previously required a motion for rehearing as a necessary element in order that the determination of the Board be final and reviewable by this Court, pur-

an express provision in our Minimum Wage Act as to the necessity of a motion for reconsideration, the petitioners were not compelled to file objections before the Minimum Wage Board after the mandatory decree was approved.[3] Therefore, the motion to dismiss filed by the Board shall be denied. We shall now turn to consider the objections raised by the petitioners before this Court.

■■ In their brief petitioners assign several errors which are equivalent to objections made against Decree No. 22. We shall take jointly the first two errors assigned. They read as follows:

That the evidence in which respondent based its determination with reference to basic necessities for hotel employees is totally insufficient and does not support the findings of the Board in this particular.

That the Board made no findings of fact nor was there any evidence on which to base a determination that the working conditions in the industry are prejudicial to the maintenance of the necessary living standards for their health, efficiency and general welfare.

These two objections refer to the alleged absence or insufficiency of the findings of fact and of evidence as to the basic necessities and the working conditions in the industry of hotel employees. Section 1 (d) of the Act reads thus:

"It is further declared to be the policy of this Act to insure the progressive development of agriculture and of the industries and businesses which operate in Puerto Rico, by endeavoring to give them assurance of conditions favorable to

---

suant to paragraph D of § 24. *A. Roig Sucrs.* v. *Minimum Wage Board*, 67 P.R.R. 545. But Act 451 of May 14, 1947, upon amending anew § 24, eliminated said element. *A. Roig Sucrs.* v. *Minimum Wage Board, supra*, n. 1. This emphasizes more strictly the intention of the legislature in not requiring a motion for reconsideration as a prerequisite to judicial review.

[3] Incidentally, and by way of analogy, in *Labor Board* v. *Jones & Laughlin Co.*, 331 U. S. 416, 427, the United States Supreme Court held that as to questions arising after an order is issued by the National Labor Board, an appellant may not file objections before the Board as to said questions.

their economic stability and natural expansion, and, to that effect, the body created for carrying out the purposes of this Act shall fix wages, having due regard to the costs, the financial condition of industries and branches of production, the market fluctuations, and the special conditions prevailing in each locality, as well as the living and working conditions of the workmen."

Section 3 of the Minimum Wage Act provides, in part, as follows:

"Section 3.—(As amended by Act No. 48 of June 10, 1948). It shall be the duty of the board to study the wages, working hours, and labor conditions which prevail in the different occupations, businesses and industries, and to make investigations regarding the living conditions of the laborers, as well as the costs and financial conditions of the enterprises, industries and other production undertakings."

Pursuant to § 6, as a prerequisite to the commencement of proceedings for the approval of a decree, the Board must determine that wages paid in any industry, business or occupation are insufficient to satisfy the normal needs of the workers or that the working day and the labor conditions are detrimental to the maintenance of the reasonable standard of living necessary for their health, efficiency and general well being. Under § 12, in fixing minimum wage, the Board shall take into consideration the cost of living and the needs of the laborers and shall fix the highest minimum wages that can reasonably be paid by the industry, business or occupation in question, provided it does not bring about a substantial decrease in employment.

It is clear from these provisions that the Board must reach a determination or conclusion as to the necessities and living and working conditions of the workers. The Act does not specifically provide that the decree itself should contain special conclusions expressly enumerated.

Irrespective of the technical question as to whether the absence of said statutory requirement implies that the validity of the decree may not be challenged on said ground (*Cf. Cal.*

*Drive-In Restaurant Assn.* v. *Clark*, 22 Cal. 2d 287; 147 A. L. R. 657; *Pacific States Co.* v. *White*, 296 U. S. 176, 186), the decree challenged indicates that the case at bar contains adequate determinations as to the needs of the laborers. In order that this Court may dutifully comply with its judicial function of review, it is highly salutary and convenient that said findings be stated in the decree. *Securities Comm'n* v. *Chenery Corp.*, 332 U. S. 194; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388; *Opp. Cotton Mills* v. *Administrator*, 312 U. S. 126; *U. S.* v. *Carolina Carriers Corp.*, 315 U. S. 475; 34 Cornell L. Rev. 473, 492; *"Administrative Findings"*; *U. S.* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 511, where Mr. Justice Cardozo says: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." Anyway the determinations contained in said decree are legally sufficient. The decree opens with the following pronouncement:

"1. Determination of Insufficiency of Wages.

"The Minimum Wage Board considered in a special session of December 19, 1951 several statistics which had been compiled on the working and living conditions of employees in the hotel business. After analyzing these statistics in the light of an adequate minimum budget of expenses of a working family of average size of said employees, it was determined that the wages paid in the hotel business are insufficient to satisfy the normal necessities of employees who work in said business."

Furthermore, on pages 12 to 19 of the decree the living and working conditions of said workers are listed in detail with numbers and statistics.

The determinations of the Board as to the aspect in question were legally sufficient. The Board was not required to make specific and formal findings, nor separately numbered paragraphs since Rule 52 of Civil Procedure was not applicable and said findings appeared in form of general statements specially if the decree represented the judgment, intention or action of the Board. *Johnston Seed Co.* v. *United*

*States,* 191 F. 2d 228; *State of New York* v. *United States,* (1951) 98 F.Supp. 855; *Baltimore & O. R. Co.* v. *United States,* (1951) 100 F.Supp. 1002; *Riss & Co.* v. *United States,* 100 F.Supp. 468; *Florida* v. *United States,* 282 U. S. 194. The essential thing is that the determinations should refer to the basic facts without the Board being compelled to "annotate" each finding with the evidence supporting it. *U. S.* v. *Pierce Auto Lines,* 327 U. S. 515; Davis, *Administrative Law,* p. 531.

▉ Let us see whether the findings of fact made by the Board as to living and working conditions of the laborers and employees are supported by the evidence presented before said Board. Section 24 of the Minimum Wage Act provides that: "the findings of fact at which the board, acting within its powers, may arrive, shall, in the absence of fraud, be conclusive," and that "the court may affirm, annul or remand to the board for further action, the decree, regulation, resolution or order; but the annulment or remanding shall be only on the ground that the board acted without authority or beyond its powers." This Court has assumed, without argument, that said provisions imply that the Board shall have had before it substantial evidence. *Luce & Co.* v. *Minimum Wage Board,* 62 P.R.R. 431, 453; *Hospital San José* v. *Minimum Wage Board,* 63 P.R.R. 717. In *Sunland Biscuit Co. Inc.* v. *Minimum Wage Board,* 68 P.R.R. 345, it was held that in the absence of fraud the findings of fact of the Minimum Wage Board should be regarded as conclusive by this Court.

Before considering petitioners' allegation to the effect that the determination of the Board under discussion is not supported by the evidence, we deem it advisable to make a brief summary of the case law with respect to the conclusiveness of an administrative pronouncement and as to the scope of the right of judicial review in said case. Naturally the case law depends on the particular statute involved in each case, and, as a general rule we are not bound by the

views of other courts even though we find it wise to be aware of the mental reaction of other judges upon confronting problems similar to the one under consideration here. Until recently the federal statutes with reference to administrative regulations provided that the determinations made by boards and administrative agencies were final if they were supported by substantial evidence. Even if the word "substantial" were omitted the courts would add its meaning judicially. Davis, *Administrative Law*, 869; *Labor Board* v. *Columbian Co.*, 306 U. S. 292; *Edison Co.* v. *Labor Board*, 305 U. S. 197. As stated in the admirable opinion of Mr. Justice Frankfurter in *Universal Camera Corp.* v. *Labor Board*, 340 U. S. 474, 487, the courts, under the former rule, had the tendency not to examine the whole evidence introduced before the Board, and they looked solely to the evidence favorable to the Board's position, and if it was prima facie sufficient they upheld the validity of the judgment. A new Federal Labor Act (Taft-Hartley) was then approved and also the Administrative Procedure Act. Both provided that administrative action must be supported by substantial evidence but on review the court should examine the whole record or the whole evidence. As indicated in the *Universal Camera Corp.* case, under said legislation the canvassing of the whole evidence is a requirement in order to ascertain whether there actually exists contradictory evidence or if there is an actual conflict in the evidence. Under the aforesaid statutes and according to the opinion cited, in order to determine whether the evidence is substantial, whatever evidence fairly reduces or detracts from its weight must be considered, to the extent that a court can not conscientiously find that the evidence is substantial, when viewed in the light of the whole evidence including that part of the evidence opposed to the Board's view and to the extent that it must be clearly shown that the decision of the Board is not justified by a fair estimate of the worth of the evidence. *Universal Camera Corp.* v. *Labor Board*, *supra*, pp. 488, 490. However,

the United States Supreme Court itself points out in the case we are citing that in all this Congress expressed a mood, by legislation, to the effect that courts should assume a greater responsibility for examining the whole evidence. Congress did not establish a rigid rule nor was it intended to negative the primary function of the Boards as agencies equipped or informed with experience or specialized knowledge. The intention was to make judges feel that they were not to abdicate their judicial functions and become mere automata compelled to respect blindly the findings of a Board, but never that courts should substitute their judgment for the expert judgment of a board. Pursuant to the *Universal Camera Corp.* case if two conflicting views are brought before a Board or different inferences of fact which are fairly in conflict, the court should examine the record in order to ascertain whether there is actually a reasonable conflict, and if there is, the court must respect the Board's view or choice, even though the court would have made a different choice had the matter been before it *de novo*. In brief, the opinion in the *Universal Camera Corp.* case represents an admonition to the courts to examine the whole record but it does not introduce transcendental innovations to the doctrine of review of administrative actions. Davis, *op. cit.*, p. 925, and see the excellent article of the case under discussion by Professor Jaffe, in 64 Harv. L. Rev. 1233: *Judicial Review: Substantial Evidence on the Whole Record*. Even under the statutes already mentioned the following doctrines remain outstanding: (1) substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, *Edison Co.* v. *Labor Board, supra;* (2) That if a reasonable and authentic conflict exists in the evidence, the court must consider the determination of the Board as conclusive; (*Capital Transit Co.* v. *United States*, 97 F.Supp. 614; *Consolidated Royal Chem. Corp.* v. *Federal Trade Com'n*, 191 F. 2d 896); (3) The ruling of a Board on the credibility of the witnesses must be respected, (*Steelco Stain-*

*less Steel* v. *Federal Trade Commission*, 187 F. 2d 693; *Hudnell* v. *O'Hearne*, 99 F. Supp. 954); (4) a determination of the Board having a rational basis is conclusive. *Miss. Valley Barge Co.* v. *U. S.*, 292 U. S. 282; *National Labor Rel. Bd.* v. *Tri-State Casualty Ins. Co.*, 188 F. 2d 50; *Capital Transit Co.* v. *United States, supra.*

We have assumed the responsibility of examining the whole evidence presented before the Board. As to the living and working conditions of the workers as stated in the decree itself, the Board based its findings on several statistics which had been compiled for its Bureau of Investigations and Statistics which statistics were admitted in evidence. They were admissible and they could serve as a basis for the findings of the Board. *Opp. Cotton Mills* v. *Administrator, supra*, pp. 154, 155. However, petitioners set up the following objections to these statistics:

(1) That it was in December 1951 that the Board made a determination as to the insufficiency of the wages in view of the living and working conditions of the workers, the Board then engaging in the preparation and approval of the decree and that at that time some statistics were informally presented to the Board and that it was not until March 1952 that the Bureau of Investigations and Statistics sent its formal report to the Board. On April 3, 1952, the draft for a decree was approved. It is manifest therefore that prior to the approval of the draft for a decree the Board had already in its possession an adequate statistical report on the problems mentioned. In addition, at the hearing held subsequently before the Board a complete set of statistics was introduced in evidence which was considered by the Board for the purpose of approving the decree. Petitioners had the opportunity to introduce adverse evidence to the facts appearing in said statistics.

(2) That the report was made on the basis of 483 families despite the experts having in their possession payrolls of 1122 families.

(3) That the finding of the Board was erroneously made on the basis of members of a family instead of dependents, without taking into consideration any other income from the other working members of the family. The Board considered that an average of 4.3 members per family of each employee was correct and the petitioners presented evidence tending to show that their employees had an average of 3.3 dependents. Assuming that the averages offered by the petitioners are correct upon adding the employee himself to the 3.3 dependents there emerges a substantial coincidence in the averages used by the Board and by the petitioners.

(4) That from the statistics used by the Board employees earning a salary over eighty cents per hour were excluded. It has not been shown that by including those employees the average rate would have increased so substantially as to render the determination of the Board arbitrary, bearing particularly in mind that the 65.4% of the employees of the so-called "big hotels" of San Juan earned less than fifty cents per hour.

(5) That the period of time covered by the statistics referred to months not typical inasmuch as during those months the movement of guests in the hotels was less than in other months, especially bearing in mind that the petitioners introduced evidence as to the living and working conditions during the months of greater movement. Naturally, the evidence presented to the Board must keep a reasonable similitude with the situation under investigation by the agency, and the period of time considered should not be too remote to the time of approval of the decree. But it has not been proved that the Board acted arbitrarily or unreasonably in basing its determination on the situation prevailing in the period of time chosen.

In brief, in the light of the provision of § 24 of the Minimum Wage Act, the findings of the Board as to the living and working conditions of employees are not void and the Board did not act "without authority and beyond its powers."

These findings were based on substantial evidence sufficient for a reasonable mind to support said findings. The whole record does not alter the weight of the evidence on which the Board made its findings. The settling of the conflict in the evidence is conclusive and the Board had a rational basis for its decision. Therefore, the first two errors assigned were not committed.[4]

 The third error assigned by the petitioners reads as follows:

"That the Hilton Hotels International, Inc., alleges that the respondent Board committed error in prescribing classification for hotels having casinos, either under the management of the employer himself or of another person, on the following grounds:

"(1) That the Minimum Wage Act grants no authority for making said classification and that said classification is in violation of the provisions of § 12 of the Act.

"(2) That said classification, even if authorized by law, would be arbitrary, unreasonable and discriminatory and would deprive the petitioners of their property without due process of law in contravention of § 7 of Article II of the Constitution of the Commonwealth of Puerto Rico and in addition it would deprive said petitioners of the equal protection of laws, in contravention of the same Section of the Constitution.

"(3) That the aforesaid classification, although apparently made on the basis of the operation of a casino, is actually based on the supposed greater ability of one or more units to pay higher wages, which is in contravention of § 12 of the Minimum Wage Act, said basis having been rejected by this Court in *American R.R. Co.* v. *Minimum Wage Board,* 68 P.R.R. 737.

"(4) That the Board did not have before it sufficient evidence to justify a different classification for hotels operating casinos either by the employer himself or by another employer.

"(5) In the event that the statute be construed as authorizing the classification of the Caribe Hilton Hotel, Condado Beach Hotel and Jack's Club, differently from others hotels in Puerto Rico, and as requiring said petitioners to pay higher wages than

---

[4] Incidentally, as to the necessity and contents of express administrative findings, see Annotations in 146 A.L.R. 209.

any other hotel in Puerto Rico, said Act flouts the fundamental constitutional provisions insofar as the Legislature has unduly delegated its power to the Board and it has unduly failed to lay down standards under which the Board may act."

The Board prescribed two categories, one, with higher wages, covering hotels with casinos operated by the owner of the hotel or by other employers within the hotel, and another with lower wages covering the other hotels.

The first allegation of petitioners as to this error is to the effect that the Minimum Wage Act itself does not authorize the Board to prescribe such a classification. We disagree with petitioners. Section 12 of the Act provides, in part, as follows:

"Section 12.—(As amended by Act No. 48 of June 10, 1948.) —In fixing minimum wages, the board shall take into consideration the cost of living and the needs of the laborers, and shall fix the highest minimum wages that can reasonably be paid by the industry, business, or occupation in question, provided it does not bring about a substantial decrease in employment.

"The Board may define any industry, business, or occupation as it may deem most advisable for the enforcement of regulations concerning wages, working hours, and working conditions.

"The work in any industry, business, or occupation may be classified according to the nature of the service to be rendered, as well as to fix minimum wage rates suitable for various kinds of works, for the purpose of fixing for each classification the highest minimum wage rate compatible with the purposes of this Act. The board may also prescribe different minimum wages for various districts or regions or for various categories or kinds of the same industry, business, or occupation when, in its judgment, such differentiation may be advisable due to the conditions existing between said districts, regions, or categories of the same industry, business or occupation provided such action does not grant competitive advantage to other districts, regions, or categories of the same industry, business or occupation; but when the minimum wage is prescribed for an industry, business, or occupation, the rate fixed shall be uniform for every kind, category, district or region of the industry, business, or occupation in question."

This Section authorizes the Board to prescribe different wages for various categories or kinds of the same industry "when in its judgment, such differentiation may be advisable due to the conditions existing between said . . . categories of the same industry." From the Act as a whole emerges the legislative pronouncement as to which are those "conditions existing", as, for example, the financial and economic situation of the units within each category (*Escudero* v. *Minimum Wage Board*, 66 P.R.R. 561), including the volume of production and of business, cost of production, income, business opportunities and facilities, (*Sunland Biscuit Co.* v. *Minimum Wage Board, supra*), transportation facilities and marketing opportunities, wages paid to workmen and economic situation in general of the workers. Section 1(*d*) declares that it is the policy of the Act, in part, that the Board shall fix wages, having due regard to the costs, the financial condition of industries and branches of production, the market fluctuations, and the special conditions prevailing in each locality, as well as the living and working conditions of the workmen. Section 3 provides likewise. Section 12 prescribes limitations to the power of the Board in the sense that (1) the industry may reasonably pay the fixed wages, (2) the wages fixed should not bring about the curtailing substantially of employment, and (3) the action of the Board in prescribing a certain classification or differentiation should not grant competitive advantage to other categories of the same industry or business.

The Act authorizes the Board to prescribe different categories within the industry or business of hotels but petitioners urge that this legislative authorization implies an undue delegation of powers, since the Act does not contain adequate standards which may serve as a guidance for the Board. This Court has already upheld the validity of the Minimum Wage Act insofar as it establishes a delegation of powers to the Minimum Wage Board. *Luce & Co.* v. *Minimum Wage Board, supra.* As this opinion well illustrates,

the modern world is characterized by a great complexity in the social and economic relations of persons, jointly with the progressive supervision of the government over the demeanor of the private individual and it implies that the legislature is unable to anticipate legislatively, in a detailed, precise and specific manner, the multiplicity of situations that might arise from these complex relations, it being sufficient for the Act in question to indicate or prescribe broad and general standards to guide or direct expert administrative agencies, in order that they may apply, with their specialized experience and knowledge, those standards concretely to the facts that may arise and fill in the details that might implement the general legislative policy. See also *People v. Rivera*, 67 P.R.R. 175, 177 and *Sifre, Etc. v. Pellón, Etc.*, 54 P.R.R. 559, 570. These standards need not be stated with mathematical precision or accuracy and they may be so broad as to justify more than one conclusion and unless the standard is not stated or be so vague as to become as a matter of fact nonexistent, the presumption of constitutionality attached to every Act is sufficient to support its validity. *People v. Martínez*, 62 P.R.R. 706. In the case at bar the standards fixed in the Minimum Wage Act already mentioned are legally sufficient and they do not give rise to an undue delegation of legislative powers.[5]

 Petitioners allege that even assuming the existence and validity of those standards and of the delegation of powers the Board did not properly exercise those powers inasmuch as the classification made by the Board is arbitrary and unsupported by the evidence. Let us see. The Board itself explained in the decree the differentiation established between hotels with or without casinos, in the following manner:

---

[5] The doctrines laid down by this Court as to the delegation of powers were recently ratified by the United States Supreme Court in *Carlson v. Landon*, 342 U. S. 524, decided March 10, 1952.

"No classification, of course, may be arbitrary. It is necessary that, in view of the purpose of the Act, the components of each class have common characteristics which distinguish them substantially from the rest.

"It may be said, in any general terms, that hotels in Puerto Rico are divided into commercial and tourist by the kind of guests who attend them. This does not mean that the clientele of the industry is divided into two airtight compartments and that a businessman who comes from within the Island to San Juan can not stay at the Caribe-Hilton or a tourist who comes from New York can not stay at the Capitol or Palace. There is, naturally, a certain elasticity in the patronage that either kind of customers gives to one or the other hotel. It is unquestionable, however, that the two types of customers circle around their respective centers, establishing two distinct orbits in the business even though both intermingle in the apex of the touristic cycle.

"Three hotels (Caribe-Hilton, Condado Beach and Normandie) of the five covered by classification 'A' of the draft for decree objected said classification. Neither Jack's nor the Escambrón, which are the other two hotels included in the same category, objected.

"Two main elements were taken into consideration before grouping those hotels under one category: (1) that the wages paid are comparable with and superior to those paid by the other hotels; and (2) that they benefit mainly from the tourist market.

"The Normandie Hotel which has neither casino nor nightclub was included within said classification because it has more than 125 rooms. We believe that there does not exist the necessary logic relation between the number of rooms, taken as the only element of differentiation, and the fact that a hotel is either commercial or for tourists. It is very plain that a hotel may belong to either class irrespective of the number of rooms.

"The same is true, also as the single element of differentiation, as to whether a hotel has a night club or not, for although a night club is a tourist tool, its mere existence does not give a hotel sufficient competitive force in the tourist market to contend with other hotels having additional facilities especially a casino or gambling room.

"The 'Gaming Act' has established by itself a classification in the hotel industry. The classification would exist even if

the Act were for strict surveillance purposes, confining itself to authorize the operation of gambling rooms on payment of certain fees. The Act, however, goes still further in the differentiation of hotels with casinos in a distinct classification. As we have seen, said Act and the said regulation of the Tourism Advisory Board makes it essential, as a necessary condition for the granting of a gambling license (for the purposes of our conclusion), that the hotel—'the establishment in a part of which the gambling room shall be operated'—be for tourists by definition and maintained 'within the same accepted international standards' for 'tourist facilities required by the Board.'

"The differential between the wages paid by hotels with casinos and the wages paid by the other hotels call for a distinct classification of hotels with casinos in order to meet the purpose of the Act (Section 12, *supra*). Otherwise 55% of the employees of the industry who work in the 3 hotels with casinos would be deprived of any visible increase in their wages and the decree would only affect the hotels with less economic capacity.

"We conclude (see Section on Effects of Mandatory Decree, *infra*) that 32 cents per hour is the highest minimum wage that may be fixed for commercial hotels in San Juan. We hereinafter offer the effect of that minimum on the payroll for 1951 of said commercial hotels and the effect it would have on the payroll for that same year of hotels with casino, also located in San Juan:

Commercial hotels of San Juan
% of employees who receive an increase........ 68. 4
% .of increase in the payroll subject to regulation 16. 7
Hotels with casinos
% of employees who would receive raise........ 14. 0
% of increase to payroll subject to regulation... 0. 7

"The comparative figures for the Condado Beach, whose wages are lower than those of the other hotel with casino which objected to the draft for decree, and for the Normandie which is a marginal hotel between both groups, are as follows:

Normandie
% of employees who receive raise.............. 59. 8
% of increase in the payroll subject to regulation 6. 9
Condado Beach
% of employees who would receive raise........ 29. 3
% of increase to payroll subject to regulation.... 1. 0

"On the other hand, the hotels with casinos, especially the Caribe-Hilton and the Condado Beach are the ones which profit the most from the tourist market, without having any competition economically in that market from any of the other hotels. The Normandie, which has no casino or other special attractions for tourists, profits slightly or marginally from said market, although more than the remaining hotels without casinos. As disclosed by the evidence of the Hotel Palace (one of the commercial hotels in San Juan), the Caribe-Hilton and the Condado Beach have taken away part of its local clientele, which tends to show that even in the very market of the commercial hotels, hotels with casinos and other attractions for tourism have more competitive force than the other hotels of San Juan.

"We conclude therefore, that the classification of hotels with casinos or gambling rooms under a separate category is reasonable and necessary in order that 55% of the employees of the hotel industry who work in those hotels may receive the benefit of the highest possible minimum wage that might be paid by that division of the industry without said classification allowing any other advantage of competition to other classes.

"As we have seen, the 'Gaming Act' is the external factor (to the Minimum Wage Act) on which is based the classification of hotels with casinos. Consequently, it is logical that we give greater weight to the subdivision made in the island under said Act 'according to their importance and commercial and tourist development' under the regulation of the Puerto Rico Economic Development Company. Although the only evidence before us consists in some estimates of management of a hotel still under construction in Barranquitas, it shows that the zones established by the Economic Development Company are also for our purposes reasonable and justified. Hotel Barranquitas, which shall not compete with hotels of San Juan with casinos and other attractions for tourism, could not reasonably maintain higher minimum wages than those fixed.

"Briefly, we have approved 2 classifications, each one subdivided into 3 zones. Under one classification we have 'hotels which have, either operated by the employer himself or someone else, casino or gambling room'; and under another 'all the other hotels.' The first classification is subdivided into the same 3 districts that have been established by the regulation of the Economic Development Company for the payment of the gambling license. The 3 zones under the second classification are the

same ones established in the draft for decree and which were not objected to.

"We finally wish to point out, to make it clearer, that the classification of hotels with casinos or gambling rooms is applicable to hotels with casinos within the same establisment even though the hotel and the casino be managed by different employers, as well as to the employer who manages himself the casino together with or in connection with the hotel, even though the gambling room and the boarding facilities are in two different establishments."

Essentially the Board based its classification on three factors, to wit:

(1) That the hotels having casino had greater economic movement and attracted more tourists, customers and guests.

(2) That as a question of fact, hotels with casinos prior to the decree paid higher salaries to employees than those included in the second category.

(3) That the classification prescribed did not give competitive advantages to another category of the same business.

We have examined the record of the hearing held before the Board and each one of its findings is supported by the evidence. Petitioners insist that the true motive of the Board for establishing said classification was that the hotels with casino had greater income than the others and that the evidence does not support said theory. The decree itself reveals the factors taken into consideration by the Board and no other motives than those expressed in the decree may be attributed to the Board. The Board's view is bolstered by the fact that the decree includes hotels with casino in the first category even if the casino is operated by a person or entity other than the owner of the hotel. In other words, the greater income of the owner of the hotel by reason of having a casino does not constitute the most relevant factor, since even when the owner of the hotel does not obtain any income from the casino because it is operated by another person, the hotel in itself has a greater economic movement due to the actual fact that there is a casino in the hotel.

It is significant that even if this Court should consider that the Board might have regarded different factors, if the Board considered other factors authorized by law and supported by the evidence, the exercise of said discretion does not imply that the Board acted "without authority or beyond its powers" under § 24 of the Act, and we must therefore respect its view. In *American Power Co.* v. *S. E. C.*, 329 U. S. 90, 105, 112, 118, it is held that a delegation of powers based on general and broad standards as to administrative actions is sufficient in view of the necessities of modern legislation dealing with complex economic and social problems and that where the legislature has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy, the selection of particular alternatives or factors by the Board should not be set aside inasmuch as the relation of remedy to policy is peculiarly a matter for administrative competence. The following appears in the opinion:

"In view of the rational basis for the Commission's choice, the fact that other solutions might have been selected becomes immaterial. The Commission is the body which has the statutory duty of considering the possible solutions and choosing that which it considers most appropriate to the effectuation of the policies of the Act. Our review is limited solely to testing the propriety of the remedy chosen from the standpoint of the Constitution and the statute. We would be impinging upon the Commission's rightful discretion were we to consider the various alternatives in the hope of finding one that we consider more appropriate. Since the remedy chosen by the Commission in this instance is legally and factually sustainable, it matters not that American and Electric believe that alternative orders should have been entered."

In synthesis, the factors employed by the Board in this case are not contrary to law and the evidence presented, and the fact that there could have been other factors does not invalidate the decree.

The case of *Opp. Cotton Mills* v. *Administrator, supra,*

dealt with the Fair Labor Standards Act, and a classification made by the Wage Administrator within an industry was challenged. The following was held:

(1) The factors prescribed in the Act on which to determine classifications are not so vague and indefinite as to imply an unconstitutional delegation of powers where the Act provides that wages shall be fixed with due regard to economic and competitive conditions and such as will not substantially curtail employment in the industry and in providing that as a prerequisite for classification the administrative agencies shall determine at the outset that said classification will not give competitive advantage to any group and that the prescribed wage will not substantially curtail employment opportunities.

(2) The administrative agencies have power to consider other factors specified in the Act, without the Act attempting to prescribe their relative weight provided they do not bring about the competitive advantage or substantial curtailment of employment already mentioned.

(3) The Administrator should consider, among other relevant factors, the competitive conditions in the industry as affected by transportation, living and production costs, and the Administrator may consider, in addition, the prevailing wage scale, as fixed and maintained voluntarily by the employer.

(4) Congress has previously accepted the administrative view as to the weight to be given to those factors.

(5) The classification made by the Administrator is supported by substantial evidence. The objections are addressed in this case (*Opp. Cotton Mills*) either to the weight of the evidence supporting the findings or to the testimony of particular witnesses or conflicting evidence. The classification made by the Administrator should be upheld by the Court. Any different conclusion would require the court to substitute its judgment of the weight of the evidence and the inferences

to be drawn from it for that of the Administrator, which the statute forbids.

The case of *Columbus & G. Ry. Co.* v. *Adm'r of Wage and Hour Div.*, 126 F. 2d 136, is also concerned with a classification within an industry made by the Wage and Hour Administrator, under the Fair Labor Standards Act. The classification established a difference between the trunk-line division of the railroad and the short line division. It was held that it was not province of the court to determine whether the classification made was the best possible or whether other factors should be considered. It was pointed out that judicial intervention should be limited to ascertaining whether there was a rational basis to determine whether the classification will substantially curtail employment or give competitive advantages. It was held that even if a particular employer loses money as the result of the wages prescribed, the determination of the wages is valid if the industry as a whole can stand it. (As to this last point see, also, *American R. R. Co.* v. *Minimum Wage Board*, 68 P.R.R. 736, 743, where it is said that when minimum wages are fixed for an industry, the industry in general and not the economic condition of a particular enterprise is taken into consideration.)

The Board made a determination based on evidence which revealed as a matter of fact, that employees in the first category voluntarily paid higher wages. This was a relevant factor tending to justify the classification. *Opp. Cotton Mills* v. *Administrator, supra.* In *Escudero* v. *Minimum Wage Board*, 66 P.R.R. 561, 565, the following is stated:

"The best answer to this contention is found in the order of the Board denying the motion for reconsideration, reading in part as follows: 'The testimony shows that in the first zone salaries a little higher than those paid in the second zone can be paid, because marketing opportunities, a good sales price, access to raw materials and transportation facilities are less available in the second zone. The testimony shows that as a matter of fact higher salaries are being paid in the first zone

than in the second zone. For all these reasons, the classification is reasonable. *See Luce & Co.* v. *Minimum Wage Board,* 62 P.R.R. 431, 437, footnote 3.' "

The evidence also supported the finding that the classification prescribed did not curtail substantially employment opportunities nor did it give competitive advantages to other groups within the industry or business. In *U. S.* v. *Pierce Auto Lines, supra,* at pages 535, 536, the United States Supreme Court held that the Board's view as to the competitive conditions, when supported by sufficient basic evidence, shall not be set aside by the court. In the recent case (May 1952) of *Swift & Co.* v. *United States,* 343 U. S. 373, the Supreme Court held that decisions of the Interstate Commerce Commission as to matters requiring expert consideration and administrative judgment, including questions with reference to the existence of competitive advantages, should not be set aside by the courts if the Commission gave weight to relevant factors. See also the still more recent case of *Fed. Trade Comm'n* v. *Ruberoid Co.,* 343 U. S. 470. The same court had indicated, speaking through the former Chief Justice Stone, that a court has done its duty when it decides that an administrative agency has acted within the statutory bounds of his authority, and that his choice among possible alternative standards adapted to the statutory end is one which a rational person could have made. *Security Adm'r* v. *Quaker Oats Co.,* 318 U. S. 218.

We have discussed certain basic doctrines of Administrative Law whose development has given rise to sharp controversies caused by the difference between two attitudes towards a government philosophy. On one side, the theory of those who, responding to the demands of modern civilization, pretend to grant an almost absolute autonomy to administrative agencies, and on the other side, the theory of those who wish to subordinate said agencies to judicial judgment, under legal rules, for the purpose of safeguarding the continuation

of a government of laws and not of men. In fact we should not overemphasize the virtuality, exclusive, according to some, of the expert knowledge of administrators. Diverse areas exist where the courts may consider, most properly, questions of an administrative nature. Nor would it be convenient to transplant to our own peculiar atmosphere, rather artificially, doctrines of administrative law which respond to an industrial reality possibly different from ours. But the judge does not have a very ample opportunity to impose his private views when the legislature has expressed itself specifically. The judicial robe should not destroy the intellectual personality of the judge but it emphatically imposes on him the judicial duty of complying with the statutes.[6] Our Legislative Assembly has already seen the necessity and convenience, in view of the special problems of our people, of creating a great number of administrative agencies and of granting them broad powers on questions of fact. The Minimum Wage Act provides, as we have seen, that the fact findings of the Board shall be conclusive in the absence of fraud or of actions in excess of the authority and power of the Board. A literal and strict construction of this provision could make this Court but an echo of the Board. But despite the requirement that the findings be based on substantial evidence, as defined, the consideration of certain factors by the Board, as to the points already discussed, has a rational basis in the evidence and in the statute. For this reason we believe that the first three errors assigned have not been committed.

The next three errors assigned by petitioners are as follows:

"The Hilton Hotel International, Inc., alleges that the respondent Board committed error in fixing a minimum wage of 36¢ per hour for employees of said petitioners who regularly and in the course of their employment receive tips from the guests because

---

[6] See the statements of non-participation of Mr. Justice Frankfurter in *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451, 466.

"(1) Said portion of Mandatory Decree No. 22 is not supported by any finding of fact.

"(2) Said portion of Mandatory Decree No. 22 is contrary to the evidence presented to the Board.

"(3) Said determination violates the provisions of § 12 of the Act in the sense that said determination does not take into consideration the necessities of the workers affected.

"That the portion of the classification objected to in this paragraph and which fixes a wage of 40¢ for the employees not included within first classification of the first zone is not based on a determination that the petitioners are in an economic position as to be able to pay the fixed wage.

"That the respondent Board committed error in imposing a condition requiring employers classified in Group A of Article IV of the Mandatory Decree to prove, in the case of bus-boys and maids, over the signature of the employee or in any other authentic manner that the employee has received weekly the amount of $1.60 in tips because

"(1) Said condition is not supported by the evidence before the Board, and (2) said condition imposes on employer such obligations and duties as he is unable to fulfill."

Decree No. 22 establishes that, as to hotels having casinos or gambling rooms, the minimum wage of 36 cents per hour shall be paid to the "following employees who may regularly receive in the course of their work tips from lodgers: Waiters, Bus-boys, Bar-tenders, Maids and Bell-boys. The other employees shall receive 40 cents per hour." It also provides that "in the case of bus-boys and maids the employer shall ascertain under the signature of the employee or in some other authentic manner that the latter has received weekly at least $1.60 in tips, in default of which the employer shall be entitled to the difference to make up the minimum wage fixed for classification (b) of the corresponding zone." [7]

[7] As to the hotels with casino in Ponce, Mayagüez and Arecibo the decree fixes 31 cents per hour for the employees mentioned who receive tips and 35 cents for the other employees, and as to the other cities and towns 28 cents per hour for the employees with tips and 32 cents for the others.

In the Findings of Fact the following is stated by the Board with respect to tips:

"C—Tips.

"It is of common knowledge that the customers of a hotel are accustomed to give tips to employees who directly serve them. This happens invariably with the waiters when the customer pays the bill. From the tips received by the waiters the bus-boys receive their share according to the evidence introduced by the Condado Beach and the Caribe Hilton. It is also customary to give tips to the bar tenders. The same with the bus-boys; and the evidence shows that the maids also receive tips, at least in the big hotels of the capital.

"The amount in tips received by employees has not yet been determined with reasonable accuracy. However, the evidence of the Caribe Hilton and the Condado Beach convinces us that the amount received in tips by the designated employees is quite substantial, with the possible exception of the maids. . . .

"This other objection of the employer to the draft for a decree is apparently intended to obtain a reduction in the increase as a whole of the minimum wages. We believe that the approval of a differential between the minimum wage of employees who receive tips and the minimum wage of those who do not, should not have that result.

"This differential is justified solely as a labor provision to obtain a higher minimum wage for those employees who do not derive the benefit of an additional earning received by others in tips. In this way, the differential for tips may serve the genuine purpose of giving higher wages to employees in greater need at the expense of those less needy, but without thereby giving to the hotel business any undue advantage. In other words: with or without the differential, the hotel industry should pay as high a salary as its economic situation permits.

"Eight of the States of the Union (and the District of Columbia) where minimum wage decrees prevail for hotel and restaurants employees have followed the differential rule in minimum wages in favor of employees who do not receive tips. Seven other states and the Commonwealth of Puerto Rico have not followed said rule, but fixed minimum wages without any differential for either kind of employees. Hence it is not a wide-spread rule but rather a well-balanced division as to the principle that should prevail with respect to the point under discussion.

"The position favoring the differential, viewed in the light of a labor measure, can not be logically abridged in theory. Perhaps it is due to the difficulties in the practical application of the differential—always surrounded by limitations of language inaccurately used—that its adoption has not been widely spread, half of the jurisdictions having adhered to the reason of practical convenience instead of to the theoretical reason. (There is no better decree—for employers and employees as well as for officers who must see to its performance—than one of easy application.) To this last position we give our adherence as the general rule. It is with reluctance that we shall depart from it only upon the advancement of the most cogent reasons.

"As we have previously stated the evidence of the Caribe Hilton and the Condado Beach has convinced us that the waiters and bus boys, the bartenders, the bell boys and the maids of said hotels receive in tips, with the possible exception of the maids, quite a considerable amount of money during the course of their work. This evidence justifies that we depart, as to the classification of hotels with casino, from our rule of not establishing the above mentioned differential. In establishing it for these hotels, we have adopted the same differential of four cents proposed by the Condado Beach, which is reasonable. In adopting the new rule however, we have not reduced the total increase in wages which we believe said hotels are able to pay.

"According to Article IV of the decree which we approved, the classification is limited to all those employees, who . . . may regularly receive, in the course of their work, tips from the lodgers, and it was added: 'Provided that in the case of busboys and maids the employer shall ascertain under the signature of the employee or in some other authentic manner that the latter has received weekly at least $1.60 in tips, in default of which the employer shall be entitled to the difference to make up the minimum wage fixed for [the other employees] of the corresponding zone.'

"The bus boys were included in said Proviso because they do not receive the tips directly from the guests but only a share of the tips received by the waiters. The maids were also included in said Proviso because they hold a marginal position in the group of employees who receive tips. We took into consideration the smallest amount they apparently receive in tips as well as the fact that the service rendered by them to the guests is not immediately connected with the payment of the bill as is

the case with waiters and bartenders, nor is it as personal as in the case of the bell boys. If we had not included the maids in said Proviso, we would have excluded them from the classification of employees who receive tips. Their inclusion in the Proviso is a conciliatory measure in the midst of the doubts entertained by the members of the Board as to their inclusion or exclusion from said classification.

"We reached the amount of $1.60 which is the minimum that the bus boys and the maids must receive in tips by multiplying the 4 cents differential by 40 hours, 8 hours less than the regular working week. We believe this is a reasonable amount."

Section 12 of the Minimum Wage Act provides, in part, "The work in any industry, business, or occupation may be classified according to the nature of the services to be rendered, as well as to fix minimum wage rates suitable for various kinds of works, for the purpose of fixing for each classification the highest minimum wage rate compatible with the purposes of this Act."

What the Board did was to establish an occupational classification, as to tips, to the effect that the employees who received tips should earn 4 cents less, per hour, than those who do not receive any tips. It amounts, impliedly, to a provision to the effect that the tips shall be considered as a part of the minimum wage. The classification among employees was justified by the provisions of § 12 and this classification is not arbitrary, since it is supported by the evidence presented by the Board. The Board had a rational basis for this classification and acted correctly within the powers delegated upon it.

In general terms, this Court has held that a classification made by the Board for skilled and semi-skilled laborers is valid. *American R. R. Co.* v. *Minimum Wage Board, supra.* A classification for employees is valid if it has a reasonable basis and if there exists a rational relation between the purpose pursued and the classification made. 31 Am. Jur. 1038, 1039. It has been specifically held that a classification made

on the basis of tipping is not discriminatory nor invalid in view that it may be aimed at curing evils contrary to legislative policy. *Cal. Drive-In Restaurant Assn.* v. *Clark, supra;* 147 A.L.R. 1028, 1036. In *Williams* v. *Jacksonville Terminal Co.,* 315 U. S. 386, the United States Supreme Court held that under the Federal Fair Labor Standards Act an administrative provision to the effect that tips may be considered as a part of the minimum wage is constitutionally valid and it is not discriminatory. In the opinion it is indicated that it was not the intention of the Act to eliminate the tipping system, nor to give preference to those employees who receive tips over those employees who do not render services directly. It is further stated in the opinion that said provision tends to avoid the irregular income from tips and increases wage security and that "the desirability of considering tips in setting a minimum wage, that is, whether tips from the viewpoint of social welfare should be counted as part of that legal wage, is not for judicial decision," but it falls within province of administrative agency. Tips may be considered as a part of the wages. *Moyd* v. *Atlantic Greyhound Corp.,* 170 F. 2d 302; *Harrison* v. *Kansas City Terminal Ry. Co.,* 36 F. Supp. 434, affirmed in 126 F. 2d 421, 422; *Ryan* v. *Denver Union Terminal Ry. Co.,* 126 F. 2d 782. See, also, the notes in 40 Col. L. Rev. 1262 and 147 A.L.R. 1039. In *Cal. Drive-In Restaurant Assn.* v. *Clark, supra,* the California Supreme Court went so far as to decide, with reference to wages of restaurant employees, that a statute which prohibits the retention by employer of tips as a part of the minimum wage is valid.

Petitioner alleges that it challenges the validity of classification in question because it is not supported by any fact determination or by the evidence. The portions copied from the decree show that there was an adequate finding of facts. We have examined the record of the hearing and there is substantial evidence to justify said finding. Petitioner also alleges that said determination does not take into consider-

ation the necessities of the workers in question. Irrespective of whether or not petitioner has standing to question the effect of the decree as to the employees, petitioner has not proved that the classification prejudices the employees from the viewpoint of their necessities. Furthermore, the Board could have considered other factors specified in the Act such as "fix the highest minimum wages that can reasonably be paid by the industry . . . provided it does not bring about a substantial decrease in employment," and even if said minimum wage would be in excess of the minimum necessities of the workers.

As to the fixing of 40 cents per hour as minimum for employees who do not receive tips, the Board made an adequate determination to the effect that the economic situation of the petitioners is such that they are able to pay the wage fixed. This determination has not been controverted by the petitioners.

 The provision of the decree establishing that in the case of bus boys and maids the employer shall prove, over the signature of the employee or in any other authentic manner that the employee has received the weekly sum of $1.60, is likewise challenged. It is alleged that it would be very difficult and improbable for those employees to comply lawfully with said provision. This allegation is not sufficient to render that part of the decree void. This system was administratively adopted and whether it is wise or unwise does not fall within the ambit of competency or of judicial review, inasmuch as it does not imply the absence of power or authority of the Board, and its effectiveness has not yet been tested in practice.

 ██ The seventh error assigned by the petitioners reads thus:

"That the respondent Board committed error in approving Article V of Mandatory Decree No. 22 for the following reasons:

"(1) Insofar as Article V (A) of Mandatory Decree No. 22 compels an employer to pay to an employee who works more

than 20 hours a week, but less than 32, a weekly salary not less than the product of multiplying the rate per regular hour which he is receiving by 32, said provision of Mandatory Decree No. 22 violates petitioner's right according to § 7 of Article II of the Constitution of the Commonwealth of Puerto Rico, by depriving petitioners from their property without due process of law, and depriving petitioners from the equal protection of law in the sense that petitioners shall be compelled, under said provision, to pay for work not performed and for which petitioners have made no contract.

"(2) That the requirement of paying at one and a half time to all employees who work 20 hours or less per week is arbitrary, unreasonable and discriminatory for the same reasons listed in the preceding paragraph and it violates the constitutional provisions already cited."

As to this particular the Board provided the following in the Decree:

"Article V—Minimum Weekly Compensation Guaranty

"A—Every employee working more than twenty (20) hours a week, but less than thirty-two (32), even though he is available for work, shall, except in case of 'vis major,' be entitled to a weekly salary not less than that resulting by multiplying by thirty-two (32) the regular rate per hour he is then drawing. For the purposes of this clause, it shall be considered that the employee is not available for work only when he does not appear in person at the work, refuses to work, or is so ill that he is unable to carry out his habitual tasks.

"B—Every employee working twenty (20) hours or less a week shall be entitled to a weekly salary not less than that resulting by multiplying the working hours by one and one-half the regular rate per hour he is then receiving."

The effect of this provision is in part to guarantee a weekly minimum wage even if the employee has not worked the entire regular hours during the week. For example, an employee who has worked only 25 hours during the week would receive a weekly minimum wage on the basis of having worked 32 hours during the week. The petitioners, in brief, alleged the following:

· (1) That minimum guaranteed-wage rule is not authorized by the Minimum Wage Act.

(2) That it is not supported by the evidence presented to the Board.

(3) That this provision is unconstitutional because it deprives petitioners from their property without due process of law, since they are compelled to pay wages for time during which those employees have not rendered any work or services to their employers, that is, they are compelled to pay compensation without the *quid-pro-quo* of services for said compensation, in other words, according to the example set forth, those employees who have only worked 25 hours during the week would be paid, additionally, for seven hours during which they did not work for the employer.

(4) That this provision is unconstitutional because it is arbitrary and discriminatory.

The Decree contains the following findings of fact of the Board:

"Under Article V of the draft for decree the employees were allowed a minimum weekly guaranty wage corresponding to 44 working hours when they had worked weekly less than 44 hours but more than 20. This provision would have defeated the plan of economy employed by the Caribe-Hilton and Condado Beach during the months off season when the regular weekly schedule is reduced to about 36 hours instead of reducing the personnel. The Board considers that this plan is convenient for employers as well as for employees and that there is no reason for discouraging it but rather to make it feasible in view of the fact that it tends to distribute employment opportunities during the period of less economic activity in the tourist hotels. Consistently with this view the guarantee was reduced to 32 hours which we believe is reasonable because it amounts to 4 regular working days."

With respect to the allegation that the Act does not authorize the guaranteed-wage rule we must indicate that: (*a*) § I of the Act declares that the policy of the Act is, in part, the establishment of minimum standard of living

necessary for the health, efficiency and general well-being of workers in different occupations, without substantially curtailing employment or earning power, as well as to protect the workers in the means of livelihood and living standards; (*b*) § 3 provides that it shall be the duty of the Board to study the wages, working hours and labor conditions and to make investigations as to the living conditions of the laborers; (*c*) § 6 authorizes the Board to proceed with the approval of a decree whenever the Board shall determine that the wages paid in any industry or business are insufficient to satisfy the normal needs of the workers or that the working day and the labor conditions are detrimental to the maintenance of the reasonable standard of living necessary for their health, efficiency and general welfare; (*d*) § 8 authorizes the Board to fix whatever wages, working hours and working conditions should be established, that is, the minimum wage rate for regular or extra periods of work, or of both which should be paid to them the maximum working hours per day, week or a greater period and the necessary working conditions for the maintenance of their health, safety and well-being; (*e*) § 12 provides that in fixing minimum wages the Board shall take into consideration the cost of living and the needs of the laborers and it shall fix the highest minimum wages that can reasonably be paid by the industry or business provided it does not bring about a substantial curtailment of employment.

It is manifest that the provisions cited show that the essential purpose of the Act is to meet the minimum living necessities of the workers in the light of the economic situation of the industry. The Act does not refer to the value of services of the workers nor does it base the minimum wage to be paid to the workers on the value of their services but on their living necessities. The compensation is not commensurate with the value of services but with the cost of living of the workers, according to the statute. The specific provision in controversy does not amount to the fixing of

minimum working hours as alleged by the petitioners in stating that the Act merely authorizes the fixing of maximum hours. It rather appears to be a fixation of a weekly minimum guaranteed wage. There is nothing in the Act requiring that the wages be fixed per hour on the basis of hours actually worked but the Act does authorize the establishment of weekly minimum wages as was done in this case. In view of the foregoing we reach the conclusion that the Board acted within its statutory powers.

A different problem arises with the allegation that the action of the Board is unconstitutional insofar as it compels the employer to pay wages for services not rendered. We must stop to make a brief study of the development of the case law as to this particular. In *Adkins* v. *Children's Hospital*, 261 U. S. 525, the United States Supreme Court found void and unconstitutional a statute of the District of Columbia which fixed wages to meet the necessary cost of living for workers and it stated that the fixed wages had no relation to the value of the services of the women workers. The same was announced in *Morehead* v. *N. Y. Ex Rel Tipaldo*, 298 U. S. 587. However, it is of common knowledge that in *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, a more recent case, the United States Supreme Court expressly reversed the *Adkins* and *Morehead* cases and declared that a statute of the State of Washington providing for the establishment of a living wage, without including any factor as to the value of services, was valid. See also *United States v. Darby*, 312 U. S. 100, 125, as to the constitutional validity of the Federal Fair Labor Standards Act.

At this stage, in our social climate we can not ignore the progress achieved in the light of the opinions of the United States Supreme Court. It is unnecessary to relate again the arguments as to the validity of a legislation which embodies such a profound sense of humanity and of social justice. That is an adjudicated matter by solutions accepted by the community. It is enough to say that wages for workers may

be fixed with relation to the basic necessities for living or even for mere existence of the workers irrespective of the market value of the work, provided said wages do not arbitrarily impair the economic situation of the industry. The record does not reveal nor has it been shown, that the whole of the wages fixed, including those being discussed under the seventh error assigned, are either confiscatory or substantially prejudicial or arbitrary with respect to the economic structure of the hotel industry or business. Their only allegation is to the effect that the guaranteed wages are not commensurate with the value of the services and we have already decided this question.

Precisely in *Mary Lincoln Candies* v. *Department of Labor*, 289 N. Y. 262, 45 N. E. 2d 434, 143 A.L.R. 1078, it was held by the Court of Appeals of the State of New York that a provision of the Labor Department fixing weekly guaranteed wages in practically identical manner with our provisions of Decree 22 in question, is constitutional and valid inasmuch as wages may be fixed to meet the cost of living of workers even if said system amounts to the payment of wages for services not rendered and since the Minimum Wage Act itself of New York does not require that salaries be fixed on the basis of services rendered.[8] To require that wages be based on the value of the services may imply the defeat of the legislative purpose in providing for salaries sufficient for adequate maintenance.

On the other hand, the system adopted does not mean that the effect of said provision is to substantially curtail employment and this result has not been proved here.

The guaranteed wage amounts to a statutory modification

---

[8] The *Mary Lincoln Candies* case was decided with a divided vote of four to three of the judges of the Court of Appeals of New York. See the excellent discussion on this case in 12 Fordham L. Rev. 252: "Guaranteed Wages Under New York State Minimum Wage Legislation," where the author subscribes to the opinion of the majority and makes an effective and elaborate criticism of the opinion of the minority. See, also, 43 Col. L. Rev. 137 and 29 Cornell L. Q. 263.

of the liberty of contract between the workman and the employer. The social purpose of this modification sanctions its validity. See 43 Col. L. Rev. 643, as to the modern tendency to regulate contracts between employees and employers. The employer is not compelled to hire any one but once he uses the employee he is subject to a reasonable intervention of the State which tends to protect the workman.

In the recent case of *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, of March 1952, the United States Supreme Court upheld the validity of a statute which imposes a penalty for employers who deducted from the wages of the employees the time taken for voting. It was alleged that it implied the necessity of paying for services not rendered and it impaired the liberty of contract. In the opinion of Mr. Justice Douglas the following appears:

"The liberty of contract argument pressed on us is reminiscent of the philosophy of *Lochner* v. *New York,* 198 U. S. 45, which invalidated a New York law prescribing maximum hours for work in bakeries; *Coppage* v. *Kansas,* 236 U. S. 1, which struck down a Kansas statute outlawing 'yellow dog' contracts; *Adkins* v. *Children's Hospital,* 261 U. S. 525, which held unconstitutional a federal statute fixing minimum wage standards for women in the District of Columbia, and others of that vintage. Our recent decisions make plain that we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare. The legislative power has limits, as *Tot* v. *United States,* 319 U. S. 463, holds. But the state legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare; they may within extremely broad limits control practices in the business-labor field, so long as specific constitutional prohibitions are not violated and so long as conflicts with valid and controlling federal laws are avoided. That is the essence of *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Nebbia* v. *New York,* 291 U. S. 502; *Olsen* v. *Nebraska,* 313 U. S. 236; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; and *California Auto. Assn.* v. *Maloney,* 341 U. S. 105.
" . . . . . . .

"The only semblance of substance in the constitutional objection to Missouri's law is that the employer must pay wages for a period in which the employee performs no services. Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. See *Queenside Hills Co.* v. *Saxl*, 328 U. S. 80; *California Auto Assn.* v. *Maloney, supra*. Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization. . . . The public welfare is abroad and inclusive concept. The moral, social, economic, and physical well-being of the community is one part of it; the political well-being, another."

As to the allegation that there was no evidence to support the guaranteed-wage rule, the Hilton and Condado hotels presented evidence as to a similar system established by them. There was proof as to the living standard and conditions of employees and workers and as to the economic situation of the hotels. In view of these factors the Board could exercise its discretion as to a specific method of paying wages intended to achieve the legislative goal of an adequate living standard for the workers without unreasonably sacrificing the structure and economic situation of the hotel business. We have already seen that it is not within our province to inquire into the intrinsic wisdom of those rules if they fall within the statutory and constitutional power of the Board. It is enough if the Board had a rational basis in the evidence to establish the system in question. Nor is this system discriminatory among the workmen.

 The eighth error assigned is:

"That the respondent Board committed error in fixing the minimum wage rate for hotels which fall within paragraph B (1), (2) and (3) of article IV of the Decree challenged because:

"(1) The Board violated the provisions of § 12 of the act, having fixed a minimum wage higher than could be reasonably paid by the industry represented by enterprises included in the classification B.

"(2) That the respondent Board, violated in addition, the provisions of § 12 of the act without taking into consideration

the substantial curtailment of employment which necessarily resulted from a minimum wage fixed under § B of Article IV."

As to hotels without casinos a minimum wage of 32 cents per hour was established in San Juan, 28 cents in Aguadilla, Arecibo, Bayamón, Caguas, Guayama, Mayagüez and Ponce and 24 cents in the other towns and cities. It was not shown before the Board nor does the record disclose, that said minimum wage was higher than what could be reasonably paid by the industry represented by enterprises in the above-mentioned towns or that the minimum wage in question involves a substantial decrease in employment opportunities.

 The ninth error reads thus:

"That the respondent Board committed error in approving paragraph B of § VIII of Mandatory Decree No. 22 on vacations because

"(1) There is nothing in the evidence before the Board to justify the formula of one and one-fourth day for each month in which the workman worked at least one hundred and twenty hours as vacation period, this conclusion being therefore arbitrary and capricious."

Article VIII(B) provides that: "every employee shall be entitled to vacation leave with full pay . . . at the rate of one and one-fourth (1¼) days for each month during which he has worked not less than one hundred and twenty (120) hours." This provision amounts to a granting of fifteen days each year for vacation to those employees who have worked at least a hundred and twenty hours monthly. The concession of vacations with pay or compensation for a period of fifteen days each year is entirely reasonable.[9] In *American R. R. Co.* v. *Minimum Wage Board, supra,* on page 741, the following is stated:

---

[9] It has been suggested that it would be more reasonable to fix vacations on a percentage basis of the different wages of different employees. "Vacation-Pay Policy and Administration," 2 Labor L. J. 742. But it is not a judicial function to gauge the methods and technique employed by the Board whenever said methods are not arbitrary and have a rational basis even if other methods may prove more convenient.

". . . There is controversy, as we have already seen, regarding the vacation periods. We have not found a single case in which, by an express provision of law, vacation periods similar to those involved herein have been granted to employees or workmen of a private enterprise. See, however, *Compañía Popular de Transporte, Inc.* v. *Unión de Empleados de Transporte el al., supra,* and *People* v. *Ford Motor Company,* 63 N.Y.S. (2d) 697 (App. Div. S. Ct. N.Y. 1946). Nevertheless, the rest periods fixed, which as we have seen, amount to not more than 13 days for each year, fall within the spirit and purpose which moved the lawmaker to enact the Minimum Wage Act, and which, as we have already indicated, are, in brief, to promote the health and safety of the employees and workmen, and to protect them in their means of livelihood in such a manner as will not destroy the very sources of employment and work. The periods devoted to rest are necessary to prevent physical waste, exhaustion of energy, premature senility, and disease among the workmen. Although, apparently, by granting them the employer suffers a detriment, there is no doubt that in the long run, they turn out to be beneficial to him. The healthier and stronger the workmen of an industry are, the greater the output and efficiency of their labor become, and the fewer the absences and accidents occurring among them. Undoubtedly, vacations with pay for long periods injuriously affect the industry and business. However, the vacation periods involved herein are not unreasonable—13 days per year. On the other hand, this short period of annual vacation for its employees does not deprive the petitioner of its property without due process of law, since upon their return to work, with new enthusiasm and with new energy they will perhaps amply make up for all that which they failed to do or produce for their employer during such period. Insofar as the petitioner itself is concerned, the granting of rest periods to its employees and workmen is not a new thing. Those granted by Decree No. 12 are, by the way, on the average, less than those which the petitioner itself has been granting to its employees. According to Mr. Totti, petitioner's engineer, the vacation period granted by the petitioner to employees earning $11 weekly is one week; to those earning up to $18, two weeks; to those earning up to $26, three weeks; and to those earning $26 or more, four weeks. We reach the conclusion that the second error assigned is also nonexistent."

As a matter of fact the Board took into consideration evidence as to the effect of granting said vacations with pay, together with other provisions of the decree as to expenses, net income and general economic situation of the hotels. The economic impact of the different provisions of the decree was proved by exhibits, statistics and other evidence submitted to the Board which analyzed the numbers in its determination of fact and of law and in the different appendices of the decree.

Actually, the concession of vacation with pay is in effect an additional wage. *In re Will-Low Cafeterias*, 111 F. 2d 429; 56 C.J.S. 526, § 96. The fixing of said additional wage is a matter of discretion, system or conclusion of the Board and the exercise of said discretion may be based in evidence related to the living condition of the employees and workmen and the economic situation of the enterprise inasmuch as said factors delineate the boundaries to a determination of wages including vacation. Incidentally, the decree reads thus:

"E—Other Working Conditions

"Mandatory Decree No. 6 grants to every 'permanent' employee the right to vacation leave, with full pay, at the rate of 15 days per year. Thirty of the fifty enterprises included in Exhibit J-12 reported that they did not grant sick leave to their employees. The other 20 reported that they grant 15 days every year."

■ The tenth assignment reads thus:

"The Board erred in approving subdivision C of Article VIII of Mandatory Decree No. 22 dealing with sick leave. As approved by the Board, said provisions are arbitrary and discriminatory and deprive petitioners from the protection of the provisions of § 7 of Article II of the Constitution of the Commonwealth of Puerto Rico for the following reasons:

"(1) That said Section is ambiguous and inaccurate insofar as it does not define the diseases which entitle a workman to a sick leave, nor does it establish a reasonable and adequate method for proving the fact of the illness, thereby provoking litigation and fictitious diseases.

"(2) There is nothing in the evidence before the petitioning [*sic*] Board to justify the formula of one and one-fourth day for each month in which the workman worked at least one hundred and twenty hours as vacation period, this conclusion being therefore arbitrary and capricious.

"(3) That said paragraph C of Article VIII of Mandatory Decree No. 22, as promulgated by the respondent Board compels the employer to pay for services not rendered due to illnesses for which the employer must pay pursuant to other statutes, or for which the employer is not bound to pay, to wit:

"(*a*) Any accident occurring in the ordinary course of work and is thereby compensated by the Workmen's Accident Compensation Act, under which the employer is bound to pay the corresponding premiums.

"(*b*) Any disease resulting from pregnancy of the working woman already covered by Act No. 3 of March 13, 1942, by virtue whereof the employer shall be bound to pay time and a half to the woman during her pregnancy.

"(*c*) Any disease resulting from an accident not compensated under the Workmen's Accident Compensation Act which excludes accidents occurring under the following circumstances:

"1. When the workman or employee attempts to commit a crime or to injure his employer or any other person, or when he willfully causes himself the injury;

"2. When the workman or employee is intoxicated, provided such intoxication is the cause of the accident;

"3. When the injury is caused to the workman or employee by the criminal act of a third person;

"4. When the recklessness of the workman or employee is the sole cause of the injury."

Petitioners allege in brief that the provision on sick leave is too indefinite and does not deal with a practical, reasonable and equitable formula inasmuch as it does not contain a reasonable method for proving the fact of the illness and prevent fictitious illnesses and, besides, it does not exclude those diseases for which the employer is bound to pay in accordance with other statutes nor excludes those for which the employer need not pay under other Acts. Article VIII C of the decree provides as follows:

"C—Sick Leave

"Every employee shall be entitled to sick leave with full pay at the rate of one and one-fourth (1¼) days for each month during which he has worked not less than one hundred and twenty (120) hours. Sick leave unused by an employee during the course of the year shall be cumulative for succeeding years up to a maximum of thirty (30) days, exclusive of the number of days accumulated during any year in course. Except in case of vis major, the employee shall notify his employer of his sickness the same day he is absent. The pay for each day of sick leave shall be computed by multiplying by eight (8) the regular rate per hour which the employee was earning at the time he was taken sick."

In the explanations of the Decree, the Board said the following:

"The provision on the unused days for sick leave (Article VIII—C) tends to remedy the unreasonable result that would otherwise be brought about to the effect that an employee who has worked for one year without taking sick leave and is taken ill at the commencement of the following year would not be entitled to sick leave because the cumulated days during the preceding year in which he was not ill are cancelled.

"The right of an employee to sick leave and the duty of an employer to grant it should not depend exclusively on a medical certificate proving the illness. Said medical certificate would be unreasonable in those cases of illness where the employee can not go to work but his illness does not necessarily require medical attention. Of course, the fact that no medical certificate is required in every case does not mean that in some cases the employee might be called upon to prove his illness by such a certificate in order to be entitled to sick leave. The provision under discussion does not exclude the medical certificate in cases of illness in which such certificates may be reasonably required nor does it preclude the employer from requiring said certificate at the employee's expense whenever he deems it convenient."

Similarly as we spoke with respect to vacations, even if the Act does not expressly mention sick leave, the Board had implied authority to include in its decree a provision as to sick leave with pay, as part of the total system of minimum

wage, that is, as an ingredient of the minimum wage for the purpose of achieving the statutory goal of meeting the basic necessities of the employees by fixing a minimum wage reasonably compatible with the welfare and the economic stability of the industry. As it did in the case of vacations with pay, the Board expressly took into consideration the effect that the sick-leave provision might have on expenses and income of the industry together with other provisions relating to the minimum wage, and the Board reached the conclusion that all these provisions were compatible with the enjoyment of a reasonable benefit by the industry. The granting in itself of sick leave with pay is not unreasonable. The workers are not to blame for becoming ill.[10] Their economic situation is not sufficiently adequate to allow them the burden of an illness with the corresponding inactivity and lack of income during that period of time. On the other hand, the employer has the right to rehire those workers once they have recovered. Illnesses are anticipated risks of life and it is not unreasonable that the employer assumes the burden of those risks as a part of the general system of minimum wage, if, on the other hand, the economic situation of the employer is not unduly and arbitrarily impaired.

As to the allegation that the formula for sick-leave is too indefinite, leaving a gap for fictitious illness, we must say that an administrative provision contained in the decree should not be too specific and elaborate especially as to illness with all its medical and scientific aspects. The decree obviously refers to authentic illness. A detailed exposition of that modality should fall within the ambit of administrative action by means of the corresponding regulations. Whether an allegation of illness is genuine or not is for judi-

---

[10] Naturally, if the workman is intentionally responsible for his own illness, it could be reasonably alleged that he should not be entitled to leave with pay. But this situation should be decided administratively or judicially according to the specific facts of each particular case. The possibility of an implied exception does not render the sick leave void.

cial or administrative decision in each particular case. It is enough if we point out that the fact that a decree provision lends itself to fictitious claims, does not render said provision void nor does it imply that the Board acted in excess of its authority and powers.

Petitioner alleges that the sick-leave provision is unreasonable and arbitrary insofar as it may be applied to occupational diseases and accidents suffered under the Workmen's Compensation Act. We agree with petitioner that § VIII C of the Decree should not be construed in the sense of including those diseases which are compensable under the afore-mentioned Act inasmuch as the employer should not be compelled to pay twice for the same illness. Our conclusion on this particular does not render § VIII C of the Decree void but rather suggests that this provision should be read or construed as containing the implied restriction to the effect that § VIII C is not, and may not be, extended to diseases and accidents compensable under the Workmen's Compensation Act.

For the reasons stated in this opinion the writ of review is quashed; however, today we decided *Condado Beach Hotel Co.* v. *Minimum Wage Board* and in this opinion we held that § VI of Mandatory Decree No. 22 should be set aside. Extending this judgment to the case at bar § VI of Mandatory Decree No. 22 of August 5, 1952 should be set aside and the whole of the remaining provisions of said Decree are declared valid.